UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

JAMES STRASSNER,

                              Plaintiff,

        -vs-

                                                          DECISION AND ORDER
                                                          No. 04-CV-6021 (CJS)

PATRICK O'FLYNN, MONROE
COUNTY SHERIFF; COUNTY
OF MONROE; DEPUTY ROBERT
DAY, MONROE COUNTY DEPUTY
SHERIFF; DEPUTY PATRICK
PONTICELLO, MONROE COUNTY
DEPUTY SHERIFF; DEPUTY MARK
WEIST, MONROE COUNTY
DEPUTY SHERIFF,

                              Defendants.

_____

APPEARANCES

For Plaintiff:            Lisa G. Berrittella, Esq.
                          Trevett Cristo Salzer & Andolina P.C.
                          Two State Street, Suite 1000
                          Rochester, New York 14614

For Defendants:           Daniel M. DeLaus, Jr. Monroe County Attorney
                          Michael E. Davis, Esq. of Counsel
                          307 County Office Building
                          39 West Main Street
                          Rochester, New York 14614

INTRODUCTION

        This is an action pursuant to 42 U.S.C. § 1983 and New York State law, in which

plaintiff claims that the individual defendant deputy sheriffs, acting pursuant to policies

of the Sheriff and of Monroe County, violated his constitutional rights, and also

committed various state-law torts.  Now before the Court is defendants' motion [#24] for

partial summary judgment, pursuant to Fed. R. Civ. P. 56, and plaintiff's cross-motion

[#28] for the same relief.  For the reasons that follow, plaintiff's motion is denied and

defendants' motion is granted in part and denied in part.

BACKGROUND

Unless otherwise noted, the following are the undisputed facts of this case.

Plaintiff was arrested by defendants Robert Day ("Day"), Patrick Ponticello

("Ponticello"), and Mark Weist ("Weist"), all of whom were Monroe County Sheriff's

Deputies, in the early morning hours of January 18, 2003, as a result of telephone calls

that he had made to his estranged wife the previous day.  In that regard, Monroe

County Family Court had issued two separate Orders of Protection against plaintiff on

behalf of his wife.  The first Order of Protection was issued by the Honorable John B.

Nesbitt, Family Court Judge, on July 12, 2002, and stated, in relevant part:

> NOTICE: YOUR WILLFUL FAILURE TO OBEY THIS ORDER MAY
> SUBJECT YOU TO MANDATORY ARREST AND CRIMINAL
> PROSECUTION . . . .
>
> A petition under Article 8 of the Family Court Act, sworn to on April 15,
> 2002, having been filed in this court in the above-entitled proceeding, and
> JAMES STRASSNER having appeared with counsel,
>
> Now, therefore, on consent it is hereby ordered that JAMES STRASSNER
> observe the following conditions of behavior:
> Stay away from CHRISTINE STRASSNER . . . .
> ***
> Refrain from communication by mail or by telephone, e-mail, voice-mail or
> other electronic means with PETITIONER
>
> Refrain from assault, stalking, harassment, menacing, reckless
> endangerment, disorderly conduct, intimidation, threats or any criminal
> offense against CHRISTINE STRASSNER

> RESP[ONDENT] MAY COMMUNICATE WITH PET[ITITIONER] ONLY
> FOR WELL BEING OF CHILDREN THROUGH PARTIES' MOTHERS OR
> RESP[ONDENT'S] SISTER . . . .
>
> [T]his order of protection shall remain in effect up to an including July 12,
> 2003.

(Davis Decl. Ex. A) The Honorable Ann Marie Taddeo, Family Court Judge, issued a

second Order of Protection on August 22, 2002, which stated in relevant part:

> NOTICE: YOUR WILLFUL FAILURE TO OBEY THIS ORDER MAY
> SUBJECT YOU TO MANDATORY ARREST AND CRIMINAL
> PROSECUTION . . . .
>
> [O]n consent it is hereby ordered that James Strassner . . . observe the
> following conditions of behavior:
>
> Stay away from the home of Christine Strassner . . . .
> Refrain from assault, stalking, harassment, menacing, reckless
> endangerment, disorderly conduct, intimidation, threats or any criminal
> offense against Christine Strassner. . . .
>
> [T]his order of protection shall remain in effect until August 22, 2003.

(Davis Decl. Ex. B) The second order was less restrictive than the first, and did not

specifically prohibit plaintiff from contacting Mrs. Strassner by telephone.  At the time

Judge Taddeo issued the second order, she stated orally that it would modify the

original order.  However, the actual Order of Protection that Judge Taddeo issued was

not designated as a modified order, nor did it say anything concerning the first Order of

Protection.

On January 17, 2003, plaintiff and his estranged wife appeared in court

concerning an issue related to the custody of their two children.  Later that day,

plaintiff's girlfriend call Mrs. Strassner's apartment and left a message on her answering

machine.  Mrs. Strassner returned the telephone call, and ended up speaking to

plaintiff.  According to plaintiff, he told Mrs. Strassner that he "did not want any trouble" with her, but she replied, "No, you screwed up by getting custody of my children, and ... you're going to pay for it."

A short time later, plaintiff, who admittedly had been drinking wine, called Mrs. Strassner and left a message on her answering machine.  According to plaintiff, in the message he asked Mrs. Strassner not to "start any trouble" with the "courts" or the "cops".  Subsequently Mrs. Strassner called 911 to complain, and defendant Day was dispatched to her home.  At Mrs. Strassner's home, Day listened to the message that plaintiff had left on the answering machine.  According to Day, on the recording plaintiff was yelling and sounded angry, but did not make any threats.  Mrs. Strassner showed Day the Order of Protection issued by Judge Nesbitt on July 12, 2002.  While Day was still at Mrs. Strassner's residence, plaintiff called again, and spoke directly to Day, who referred to the Order of Protection that Mrs. Strassner had shown him.  According to plaintiff, he attempted to explain that there was a subsequent "modified" Order of Protection, but Day hung up on him.  Plaintiff called Mrs. Strassner's residence again a few minutes later, and asked Day whether he was going to arrest plaintiff.  When Day did not provide a definitive answer, plaintiff asked to speak to someone who could tell him whether or not he would be arrested.  Plaintiff later called the 911 operator twice, asking whether he was going to be arrested.

After speaking with plaintiff, Day called the Monroe County Sheriff's records office and was told that there were two valid orders of protection against plaintiff. Without seeing the second Order of Protection, Day decided to arrest plaintiff for violating the Order of Protection which Mrs. Strassner had shown him, and he asked

defendants Ponticello and Weist for their assistance in making the arrest.  Day, Ponticello, and Weist had all received police training, including Basic Police Academy and on-the-job field training, and had received certification from the New York State Bureau of Municipal Police.

Day, Ponticello, and Weist proceeded to plaintiff's home, whereupon they were let in to the house by plaintiff's sister.  Inside the house, plaintiff was standing near a table, on which he had placed his legal paperwork concerning the orders of protection, with his hands in his pockets.  Day told plaintiff to remove his hands from his pockets.  According to plaintiff, he did so and then sat down at the table.  The parties offer conflicting versions of what followed.

Plaintiff alleges that, without warning, Day "slammed [his] face on the table and threw him across the table."  Plaintiff states that after he was handcuffed, defendants sprayed pepper spray into his face  and kicked him repeatedly while he was lying on the floor.  Defendants, on the other hand, maintain that plaintiff was belligerent and appeared highly intoxicated, and that he pulled away and began fighting them when they attempted to handcuff him.  Nonetheless, they contend that they used only necessary force to effect the arrest, and that they only used pepper spray after plaintiff, who was not yet handcuffed, bit Ponticello's arm during the scuffle.

Plaintiff alleges that the officers then dragged him outside, and that in response to his requests for medical treatment due to the effects of the pepper spray, threw him into the snow and told him to rub his face in the snow.  According to plaintiff, his sister then rubbed snow in his face to alleviate the effects of the pepper spray.  Plaintiff states that he was in extreme pain from the alleged beating and from the pepper spray.  It is

undisputed that the officers called an ambulance to the scene.  However, defendants contend that ambulance personnel refused to treat plaintiff because of his violent behavior.

Plaintiff states that the officers then placed him in a police car, drove him to the Sheriff's station, placed him in a cell, and then beat and kicked him.  Plaintiff alleges that he "pleaded" with officers to loosen his handcuffs, because they were "killing him", but they refused.  Plaintiff also contends that the defendant officers did not allow him to use a sink at the jail to wash off pepper spray.  Defendants concede that defendant was not permitted to use the sink to rinse his eyes, however, they point out there is no evidence that plaintiff ever asked to use the sink, or that he requested any medical treatment from defendants.  Defendants deny that they beat or otherwise mistreated plaintiff in any way.

Plaintiff was charged with Criminal Contempt in the First Degree in violation of New York Penal Law ("PL") § 215.51(b)(iv), Resisting Arrest in violation of PL § 205.30, and Assault in the Second Degree in violation of PL § 120.05(3).  He was arraigned on the morning of January 18, 2003, and was remanded to the Monroe County Jail.  At the jail, plaintiff was seen by a nurse.  Plaintiff remained in jail for eleven days.   A Monroe County Grand Jury rendered a No Bill on or about October 3, 2003.  Following his release from jail, plaintiff did not seek medical care for approximately eleven months, at which time he obtained an x-ray of his knee.

Plaintiff commenced the subject action on January 16, 2004.  The Amended Complaint [#20] purports to state eleven separate causes of action: 1) a claim against the Monroe County, Sheriff Patrick O'Flynn ("O'Flynn"), and Day, pursuant to the Fourth

and Fourteenth Amendments to the United States Constitution; 2) a claim against Day,

Ponticello, and Weist, pursuant to 42 U.S.C. § 1983 and the Fourth and Fourteenth

Amendments for excessive force; 3) a claim against Monroe County and O'Flynn for

supervisory liability pursuant to 42 U.S.C. § 1983 (custom, policy, or practice of failing

to train); 4) a claim against Monroe County and O'Flynn for supervisory liability pursuant

to 42 U.S.C. § 1983 (custom, policy, or practice of negligently hiring and retaining); 5) a

claim against Day, Ponticello, and Weist pursuant to 42 U.S.C. § 1983 for acting with

deliberate indifference to his serious medical needs by denying him medical treatment;

6) a claim against Day, Ponticello, and Weist pursuant to 42 U.S.C. § 1983 for unlawful

imprisonment (8th and 14th Amendments); 7) a claim against Day, Ponticello, and Weist

pursuant to 42 U.S.C. § 1983 for malicious prosecution; 8) a claim against Day,

Ponticello, and Weist pursuant to 42 U.S.C. § 1983 for false arrest and imprisonment

(4th, 8th, and 14th Amendments); 9) a claim against Day for false arrest and

imprisonment under New York law; 10) a claim against Day for intentional infliction of

emotional distress under New York law; and 11) a claim against Day for negligent

infliction of emotional distress.

Following discovery, defendants filed the subject motion [#24] for partial

summary judgment, seeking judgment as to all but the second cause of action.  As to

the second cause of action, defendants deny plaintiff's allegations of excessive force,

but admit that there are triable issues of fact.  Plaintiff subsequently filed the subject

cross-motion [#28] for partial summary judgment, seeking judgment on the third, sixth,

eighth, and ninth causes of action.  Plaintiff submitted no affidavit, but instead, relies

upon deposition testimony.  Counsel for the parties appeared before the undersigned

for oral argument of the motions on March 2, 2006.

ANALYSIS

The standard for granting summary judgment is well established.  Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See, Adickes v. S.H. Kress & Co*., 398 U.S. 144, 157 (1970).  "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.).  "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir. 1996)(*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)), *cert denied*, 517 U.S. 1190 (1996).

The burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e);  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986).  To do this, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249; *see also*, FED. R. CIV. P. 56(e)("When a motion for summary judgment is made and supported as provided in this rule, and adverse party may not rest upon the mere

allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.").  Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).  The parties may only carry their respective burdens by producing evidentiary proof in admissible form. FED. R. CIV. P. 56(e).  The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

*First Cause of Action*

Plaintiff's first cause of action alleges excessive force and unlawful arrest pursuant to "the Fourth and Fourteenth Amendments to the United States Constitution". The cause of action does not refer to 42 U.S.C. § 1983.  Defendants contend that the claim should be dismissed because there is no right to sue under these provisions, apart from that provided by 42 U.S.C. § 1983, and the Court agrees.  It is well settled that "when § 1983 provides a remedy, an implied cause of action grounded on the Constitution is not available." *Pauk v Board of Trustees of City Univ. of New York*, 654 F.2d 856, 865 (2d Cir. 1981) (*citing Turpin v. Mailet*, 591 F.2d 426 (2d Cir. 1979) (en banc)).  Here, 42 U.S.C. § 1983 provides a remedy for the alleged violations of the Fourth and Fourteenth Amendments, consequently the First Cause of Action must be dismissed.

*Third and Fourth Causes of Action*

9

Defendants contend that these causes of action, alleging supervisory liability against Monroe County and O'Flynn, must fail since there is no evidence upon which the Court could find supervisory liability against them.  In support of the motion, defendants submitted an affidavit from O'Flynn, stating that it was the policy of the Monroe County Sheriff to discipline any deputy who was found to have used excessive force or to have otherwise violated any individual's state or federal rights.  Defendants also submitted an affidavit from Gary Caiola ("Caiola"), Chief Deputy to the Monroe County Sheriff, who stated that there was never a finding that Day, Ponticello, or Weist violated anyone's rights.  Caiola also described the training that each of the defendant officers received.  Plaintiff did not respond to the motion as it pertains to the Fourth Cause of Action (Negligent hiring and retaining).  However, plaintiff cross-moved for summary judgment on the Third Cause of Action, on the grounds that Day, Ponticello, and Weist were negligently trained.

The only two defendants named in the Third and Fourth causes of action are Monroe County and O'Flynn.  There is no respondeat superior liability under 42 U.S.C. § 1983, rather, a defendant must have been personally involved in the alleged constitutional violation to be held liable.  It is undisputed that such "personal involvement" may arise in the following ways:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [individuals] by failing to act on information indicating that unconstitutional acts were occurring.

10

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (citation omitted).  With regard to alleged negligent training, "a municipality can be liable for failing to train its employees where it acts with deliberate indifference in disregarding the risk that its employees will unconstitutionally apply its policies without more training." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 129 (2d Cir. 2004) (citation omitted) In this regard, "[t]he means of establishing deliberate indifference will vary given the facts of the case and need not rely on any particular factual showing. The operative inquiry is whether the facts suggest that the policymaker's inaction was the result of a 'conscious choice' rather than mere negligence." *Id.* at 128 (citation omitted)

Here, plaintiff contends that the County and O'Flynn created a policy or custom which led to constitutional violations, by failing to properly train the officers in two respects:  First, he alleges that the deputies were negligently trained concerning "how to reconcile conflicting orders of protection"; and second, he contends that Day was negligently trained beause he "did not have a clear understanding of Aggravated Harassment and Criminal Contempt." (Zimmerman Aff. ¶ 66) In support of these contentions, plaintiff cites to three pieces of evidence in the record: Ponticello's deposition at page 56, Day's deposition at pages 96-98, and the deposition of Lieutenant Schirtz at page 70 and pages 79-80. (Zimmerman Aff. ¶ ¶ 64-71)

However, these portions of the deposition transcripts do not create a triable issue of fact as to whether or not the deputies were negligently trained concerning orders of protection.  For example, Day testified merely that he was told by the Sheriff's Records Office that two orders of protection were in effect at the time.  Plaintiff maintains that Day should have known that the two orders could not both be valid.  However, he offers

no legal authority to support that view.  Rather, he only alleges, "upon information and belief", that the Order of Protection issued by Judge Taddeo superceded the Order issued by Judge Nesbitt by operation of law, because "[t]wo orders of protection issued by the same court cannot exist simultaneously." (Emphasis in original)  Moreover, while plaintiff maintains that the officers should have been taught some procedure to handle such a situation, he does not explain what that procedure might be.  However, as discussed below, the Court disagrees with these contentions, and finds that Day was not negligent.  In that regard, Day was told by the Sheriff's Records Office that both orders were valid, and even if he had viewed both orders, as plaintiff suggests he should have done, he would have seen only that each appeared valid on its face.  Nor has plaintiff shown that Ponticello or Weist were negligently trained in this regard.

Similarly, the Court finds no evidence that Day was improperly trained concerning the difference between Aggravated Harassment and Criminal Contempt.  In the deposition testimony cited by plaintiff, Day merely stated that he had originally believed that he needed to charge plaintiff with both Criminal Contempt and Aggravated Harassment, but later learned that he only needed to charge Criminal Contempt. (Day Dep. pp. 96-97)  This does not indicate that Day was negligently trained, let alone that the County or O'Flynn were deliberately indifferent to his training.  Moreover, even assuming *arguendo* that plaintiff had shown deliberate indifference in this regard, he has not shown how the alleged improper training would have had any causal connection to the alleged constitutional violations. *See*, *Amnesty Am. v. Town of W. Hartford*, 361 F.3d at 129 ("[Plaintiffs] have neglected to offer any evidence, however, as to the purported inadequacies in the Town's training program *and the causal*

12

*relationship between those inadequacies and the alleged constitutional violations.* Insofar as plaintiffs' claim is premised on a failure to train, therefore, we affirm the district court's grant of summary judgment.") (emphasis added)  Accordingly, defendants are entitled to summary judgment on the Third and Fourth Causes of Action.

*Fifth Cause of Action*

Plaintiff's Fifth Cause of Action alleges that defendants were deliberately indifferent to his serious medical needs.  It is clear that "[a] custodian of a pretrial detainee may be found liable for violating the detainee's due process rights if the official (1) denied treatment needed to remedy a serious medical condition and (2) did so because of his deliberate indifference to that need." *Universal Calvary Church v. City of New York*, 2000 WL 1538019 at  *8 (S.D.N.Y. Oct. 17, 2000) (*citing Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir.1996) and *Farmer v. Brennan*, 511 U.S. 825, 833-34 (1994)).

> The deliberate indifference standard contains both an objective and subjective prong. Under the objective prong, an inmate must prove that the deprivation alleged is 'objectively sufficiently serious' such that plaintiff was denied 'the minimal civilized measure of life's necessities.'  This includes 'not only deprivations of medical care that produce physical torture and lingering death, but also less serious denials which cause or perpetuate pain.'  The subjective prong requires a showing that defendant possessed a 'sufficiently culpable state of mind.'  The level of culpability must be something 'more than negligence, but less than conduct undertaken for the very purpose of causing harm.'

*Allah v. Goord*, 405 F.Supp.2d 265, 273 (S.D.N.Y. 2005) (citations and some internal quotation marks omitted).  With regard to medical claims, "[m]ore than minor discomfort or injury is required in order for a plaintiff to demonstrate a serious medical condition. The alleged deprivation must be sufficiently serious, in the sense that a condition of

13

urgency, one that may produce death, degeneration, or extreme pain exists." *Johnson v. Kachelmeyer*, 03-CV-0356, 2006 WL 625837 at *9 (W.D.N.Y. Mar. 9, 2006) (citations omitted); *Berdugo v. City of New York*, No. 03 Civ. 7319(HB), 2004 WL 1900357 at *4 (S.D.N.Y. Aug. 24, 2004) ("As to the first prong, it is well established that more than discomfort or minor injury is required in order for a plaintiff to demonstrate a serious medical need.") (citation omitted).

At his deposition, plaintiff testified concerning his alleged injuries.  For example, he stated that when the officers were restraining him in his house, he felt "pain in [his] left arm" (Pl. Dep. 67).  He further testified as follows:

> Q. Okay.  As a consequence of what happened at your home involving the deputies, were you aware that night that you were injured?
>
> A. No.  I just couldn't walk hardly, and I couldn't see.  . . . [M]y legs were sore, and my knee and my back, my ribs, my muscles and my whole body was sore.
>
> Q. And can you describe what you were feeling from being sprayed?
>
> ***
>
> A. My mouth, my face was just blistered.  It felt like – it just felt like it was swelled up.  I couldn't even – I couldn't touch it, so I didn't know what was going on.

(Pl. Dep. 75-76)  Plaintiff admits that the officers called an ambulance to the scene, but he maintains that he received no medical treatment from the ambulance crew. However, in this regard, he has presented no evidence to refute defendants' assertion that the ambulance personnel refused to treat him because he was acting violently.[1]

Moreover, plaintiff admits that after he complained about the pepper spray in his face,

---

[1]Plaintiff admits that he was spitting in order to get the pepper spray out of his mouth, and that he may have spit on his sister, who was attempting to help him. (Pl. Dep. 73)

his sister rubbed snow in his face to alleviate its effects. (Pl. Dep. 72-74) There is no indication that plaintiff made any further complaints about the effects of the pepper spray to defendants.  At his deposition, plaintiff stated that he had permanent "marks" on his face as a result of the alleged beating. (Pl. Dep. 85)  However, apart from asking the ambulance personnel for help, there is no indication that plaintiff asked for any medical treatment until he was placed in the Monroe County Jail following his arraignment, when he was seen by a nurse.  (Pl. Dep. 72-74, 86) At the jail, plaintiff told the nurse that he needed to "get cleaned up a little bit", and she provided him with a paper towel. (Pl. Dep. 86)  Upon being released from jail, plaintiff did not seek treatment from a doctor for ten months, when he obtained an x-ray of his knee. (Pl. Dep. 89-91)

On these facts, the Court finds that plaintiff has failed to raise a triable issue of fact on his medical deliberate indifference claim.  First, the Court finds that plaintiff did not suffer a sufficiently serious injury as a result of being sprayed with pepper spray. Rather, the record indicates that he experienced only temporary discomfort, which does not equal a serious medical condition. *Universal Calvary Church v. City of New York*, 2000 WL 1538019 at *38 (Finding no serious injury from pepper spray: "[Plaintiff] has not identified evidence suggesting that he was visibly injured of that he had any immediate injuries other than that his eyes were burning from the mace."); *Bonnin v. Eau Claire County*, No. 03-C-0065-C, 2004 WL 67478 at *4 (W.D. Wis. Jan. 13, 2004) ("Exposure to pepper spray is not a serious medical need, but even if it were, defendants did not disregard it."); *Britton v. Lowndes County Sheriff's Dept.*, No. 1:04CV160-P-D, 2005 WL 3115525 at *3 (N.D. Miss. Nov. 21, 2005) ("[P]epper spray is specifically designed to prevent serious or permanent injury."); *Adams v.Compton*, No.

15

7:04CV00258, 2005 WL 2206101 at *5 (W.D. Va. Sep. 12, 2005) (Finding no serious injury where plaintiff was hit in the face with pepper spray and also suffered "knots and bruises".); *Foote v. Houi*, No. 03 C 50001, 2004 WL 2901039 at *2 (N.D. Ill. Dec. 14, 2004) ( "While [plaintiff] experienced some obvious discomfort from coming in contact with pepper spray, he has not identified any serious medical condition that was either cause, or aggravated, by the spray."); *Fultz v. Whittaker*, 187 F.Supp.2d 695, 703 (W.D. Ky. 2001) (Noting, in context of an excessive force claim, that pepper spray is intended to cause only "temporary discomfort and disorientation.")  Similarly, the Court finds that plaintiff did not suffer any visible serious injury as a result of the alleged beating. *See, e.g.*, *Rodriguez v. Mercado*, No. 00 CIV. 8588 JSRFM, 2002 WL 1997885 at *8 (S.D.N.Y. Aug. 28, 2002) (Finding no serious medical condition following alleged use of excessive force: "[Plaintiff] has not demonstrated that any of the injuries he allegedly received during the April 26th incident were 'sufficiently serious.' Despite the suggestion that he was kneed in the back and had his head struck against the wall, [plaintiff] claims to have sustained only bruises to his head, back, and wrists.")

Even assuming, *arguendo*, that the pepper spray injury was sufficiently severe, or that plaintiff suffered a serious injury to his knee or to his head, as he claims, he has presented no evidence to suggest that the defendants were deliberately indifferent. That is, plaintiff never requested any medical treatment from defendants.  Nonetheless, it is undisputed that defendants called an ambulance to plaintiff's house, as was their procedure when pepper spray was used.  There is no evidence that defendants subsequently prevented ambulance personnel from treating plaintiff, but rather, it is undisputed that plaintiff's own behavior caused the ambulance crew to decline to treat

16

him.[2]  *See, Grayson v. Peed*, 195 F.3d 692, 696 (4th Cir. 1999) ("[T]he failure to wash

the pepper spray off Collins . . . was due to [his] own intransigence.  Although an . . .

officer offered to wash the spray off, [plaintiff] responded by yelling and kicking at the

officer."), *cert den.* 529 U.S. 1067 (2000).  Consequently, defendants are entitled to

summary judgment on the Fifth Cause of Action.

   *Sixth, Seventh, Eighth, and Ninth Causes of Action*

   Defendants contend that these causes of action, alleging unlawful imprisonment,

false arrest, and malicious prosecution[3], necessarily fail because the deputies had

probable cause to arrest plaintiff, based upon his violation of Judge Nesbitt's Order of

Protection.  Alternatively, defendants contend that, even if Judge Nesbitt's Order of

Protection was superceded by Judge Taddeo's Order of Protection, the deputies are

entitled to qualified immunity.  Plaintiff cross-moves for summary judgment on these

claims, alleging that as a matter of law there was no probable cause for his arrest.

   It is undisputed that "[p]robable cause for arresting an individual is a defense to

actions for false arrest, false imprisonment, and malicious prosecution." *Otero v.*

*Jennings*, 698 F.Supp. 42, 45 (S.D.N.Y. 1988) (*citing Zanghi v. Incorporated Village of*

*Old Brookville*, 752 F.2d 42, 45 (2d Cir. 1985)).  Here, the Court finds that there was

probable cause for Day, Ponticello, and Weist to arrest plaintiff.  In that regard, New

---

   [2]While plaintiff knows that ambulance personnel provided no treatment to him, he does not know why.  The only evidentiary proof in admissible form on that point comes from defendants. (Day Dep. pp. 120-21)(Indicating that plaintiff was swearing and spitting, which caused the ambulance crew to refuse to treat him); (Ponticello Dep. pp. 49-53) (accord); (Weist Dep. 47) ("I know EMS was there to treat him [Plaintiff].")

   [3]With regard to the malicious prosecution claim, defendants also contend that plaintiff has failed to demonstrate a triable issue of fact as to the element of actual malice.

York Family Court Act § 168 states, in relevant part:

> The presentation of a copy of an order of protection or temporary order of
> protection or a warrant or a certificate of warrant to any peace officer,
> acting pursuant to his special duties, or police officer shall constitute
> authority for him to arrest a person charged with violating the terms of
> such order of protection or temporary order of protection and bring such
> person before the court.

"Thus, New York equates an order of protection with a showing of probable cause."

*Otero v. Jennings*, 698 F.Supp. at 45; *see also, Sorichetti v. City of New York*, 65

N.Y.2d 461, 469, 492 N.Y.S.2d 591, 596 (1985) (Noting that Family Court Act § 168

"broadens the circumstances under which a peace officer may take a person into

custody beyond those enumerated in Article 140 of the Criminal Procedure Law.")

(citation omitted); *Brawer v. Carter*, 937 F.Supp. 1071, 1077 (S.D.N.Y. 1996) ("Family

Court Act § 168(1) expressly authorizes an arrest based merely upon a violation of an

order of protection, without expressly requiring probable cause to believe that the

violation was intentional.")  In the instant case, the officers were presented with a copy

of Judge Nesbitt's Order of Protection, which forbade any telephone contact by plaintiff,

and Day was present when plaintiff called Mrs. Strassner, in apparent violation of the

order.  There was probable cause, therefore, for the arrest.

Plaintiff maintains, nonetheless, that Judge Nesbitt's Order of Protection was

superceded by Judge Taddeo's less-restrictive order.  Without citing any legal authority,

plaintiff suggests that two orders of protection from the same court cannot co-exist.

However, even assuming that were true[4], the fact remains that each order of protection appeared valid on its face.  Therefore, the officers would have had no basis to disregard Judge Nesbitt's order:

> [E]ven if the order's validity was questionable, the issue here is not whether a court was to enforce the order, but whether it, on its face, constituted probable cause to arrest Otero. This court holds that it did. The order appears valid on its face, signed by two Family Court judges with authority to issue protective orders. The purpose for issuing such orders is to protect people and their possessions from domestic violence by giving police immediate authority to remove the offending family member from the premises and take him into custody. Indeed, Otero does not assert that the order was obviously defective on its face, but merely that the "until further notice" phrase made validity a question of fact. An officer need not resolve such questions when making an enforcement decision.

*Otero v. Jennings*, 698 F.Supp. at 46; *see also, Coyle v. Coyle*, 354 F.Supp.2d 207, 212 (E.D.N.Y. 2005) (Rejecting plaintiff's argument that arresting officer should have done more to determine whether order of protection was valid, court stated that, "because probable cause does not require the police to be certain that subsequent prosecution of the arrestee will be successful, it is of no consequence that a more thorough or probing investigation might have cast doubt on the situation.") (citation and internal quotation marks omitted), *aff'd* 153 Fed.Appx. 10 (2nd Cir. 2005) ; *Campbell v. City of New York*, No. 02 CV 5186 (BSJ), 2004 WL 943570 at *4 (S.D.N.Y. Apr. 30, 2004) (Finding probable cause "because the arresting officer was justified in relying upon the order of protection to make the arrest.").

---

[4]It is not at all clear that this is the case. *See, e.g., People v. Caldwell*, 159 Misc.2d 709, 713, 606 N.Y.S.2d 572, 574 (Crim.Ct. City of New York 1993) ("Under general principles of law . . . it is clear that, in the absence of a clear statement by the court that it was vacating or terminating the order issued by another judge or legal authority providing that the issuance of a new order vacates or cancels the earlier issued order, the court must recognize the continuing validity of that earlier issued order.")

*Tenth and Eleventh Causes of Action*

Plaintiff's Tenth and Eleventh causes of action allege intentional infliction of emotional distress ("IIED") and negligent infliction of emotional distress ("NIED"), respectively.   The parties do not dispute the applicable law concerning the required elements of these torts:   "The state law tort of [IIED] has four elements: (1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress." *Bender v. City of New York*, 78 F.3d 787, 790 (2d Cir. 1996) (*citing Howell v. New York Post Co.*, 81 N.Y.2d 115, 121, 596 N.Y.S.2d 350, 353 (1993)).   Similarly, a claim for NIED also requires extreme and outrageous conduct. *Mollerson v. City of New York*, 8 A.D.3d 70, 71, 778 N.Y.S.2d 475, 477 (1st Dept. 2004).

Defendants contend that the IIED and NIED claims must be dismissed, because "the conduct complained of falls well within the ambit of other traditional tort liability", and because defendants' alleged actions were not extreme and outrageous. (Def. Memo of Law p. 23)  In *Fischer v. Maloney*, 43 N.Y.2d 553, 557-58 402 N.Y.S.2d 991, 993 (1978), the New York Court of Appeals stated that, "it may be questioned whether the doctrine of liability for intentional infliction of emotional distress should be applicable where the conduct complained of falls well within the ambit of other traditional tort liability."   Subsequently, courts in New York have dismissed IIED claims where the allegations wholly overlap or are merely duplicative of other tort claims. *See, e.g., Demas v. Levitsky*, 291 A.D.2d 653, 660, 738 N.Y.S.2d 402, 409 (3d Dept. 2002) ("Here, the conduct alleged in the subject cause of action [for IIED] falls squarely within the scope of plaintiff's defamation claim and, therefore, should have been dismissed."),

*lv. to app. dismissed*, 98 N.Y.2d 728 (2002).  On the other hand, New York courts have permitted IIED claims to go forward where there were allegations of extreme and outrageous conduct that exceeded the elements of other torts. *See, e.g., Sylvester v. City of New York*, 385 F.Supp.2d 431, 443 (S.D.N.Y.,2005) ("In this case, although there undoubt[edly] is overlap between [plaintiffs'] IIED claims and their false imprisonment claims, the IIED claims are not duplicative because enough elements of the IIED claims do not fall under any of the plaintiffs' other tort causes of action."); *see also, Wahhab v. City of New York*, 386 F.Supp.2d 277, 293 (S.D.N.Y. 2005) (Denying motion to dismiss IIED claim, where plaintiff alleged that the defendant police officer's conduct "was extreme and outrageous and well exceed[ed] the ambit of traditional assault and battery.")  For example, in *Sylvester*, the court permitted IIED claims to go forward along with claims for false arrest, where the plaintiffs, who were the family members of a man who had been shot by the police,  alleged that, in addition to falsely arresting them, the defendant police officers elicited false statements from them concerning the circumstances of the shooting, and prevented them from going to the hospital where their relative was dying. *Sylvester v. City of New York*, 385 F.Supp.2d at 443-44; *see also*, *Mejia v. City of New York*, 119 F.Supp.2d 232, 284-87 (E.D.N.Y. 2000) (Finding triable issue of fact as to existence of extreme and outrageous conduct where, in addition to allegedly using excessive force, arresting officer, who lacked probable cause to arrest, subjected pregnant suspect to ethnic slurs, told her that her unborn child and other children would be taken away from her, and had her strip searched.)

In the instant case, plaintiff alleges that the defendant police officers entered his

21

home and, without provocation, slammed his head onto a table, threw him against a wall, handcuffed him, sprayed pepper spray into his face, kicked him repeatedly, dragged him outside, and put him in a snowbank before driving him to the police station.  He further alleges that at the police station, the officers punched and kicked him repeatedly for no reason, then threw him into a cell and handcuffed him to a bench. (Plaintiff Dep. pp. 66-80)  These allegations arguably go beyond that which plaintiff would be required to prove in support of a claim of battery or excessive force, and a reasonable jury might also find the alleged conduct to be extreme and outrageous. *Cf. Kirk v. Metropolitan Transp. Authority*, No. 99 CIV 3787 RWS, 2001 WL 258605 at *8 (S.D.N.Y. Mar. 14, 2001) (Granting summary judgment on IIED claim where plaintiff alleged only that officer treated him roughly, over-tightened his handcuffs, falsely accused him of a crime and threatened him with prosecution: "Although the acts [that the defendant police officer] is alleged to have committed certainly crossed the line of acceptable police practice, as fairly typical examples of excessive force, they do not rise to the level of 'outrageous' such as to support an IIED claim.")  Accordingly, defendants' motion for summary judgment on the Tenth and Eleventh causes of action is denied.[5]

CONCLUSION

For all of the foregoing reasons, plaintiff's cross-motion [#28] for summary judgment is denied and defendants' motion [#24] for partial summary judgment is granted in part and denied in part.  Defendants' motion is granted as to the First, Third,

---

[5]Although the Court is denying defendants' motion as to the claims for emotional distress, it notes that the record seems to be devoid of any evidence of severe emotional injury.  That is, while plaintiff testified at his deposition concerning various physical injuries, he apparently denied "any other complaints of injury." (*See*, Pl. Dep. 99) However, defendants did not move for summary judgment on that basis.

Fourth, Fifth, Sixth, Seventh, Eighth, and Ninth Causes of Action, which are dismissed.

Defendants' motion is denied as to the Tenth and Eleventh Causes of Action.

Accordingly, the remaining claims in this action are the Second, Tenth, and Eleventh

Causes of Action.  By separate order the Court will schedule a pretrial conference.

    So ordered.

Dated: Rochester, New York
    March 27, 2006

                      ENTER:


                      /s/ Charles J. Siragusa
                      CHARLES J. SIRAGUSA
                      United States District Judge